FREDERICK L., et al., Plaintiffs,

v.

DEPARTMENT OF PUBLIC
WELFARE, et al.,
Defendants.

CIVIL ACTION NO. 00–4510.

United States District Court,
E.D. Pennsylvania.

Sept. 5, 2002.

Mark J. Murphy, Pittsburgh, PA, Robert W. Meek, Philadelphia, PA, for Plaintiffs.

Claudia M. Tesoro, Office of Attorney General, Philadelphia, PA, Howard Ulan, Harrisburg, PA, for Defendants.

### *MEMORANDUM AND ORDER*

SCHILLER, District Judge.

Four adult individuals institutionalized at Norristown State Hospital ("NSH") commenced this action against the Department of Public Welfare of the Commonwealth of Pennsylvania ("DPW"), and Feather O. Houstoun, the Commonwealth's Secretary of Public Welfare. Plaintiffs allege that their continued hospitalization at NSH is unnecessary and Defendants' failure to provide them with appropriate services in the community violates Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). After denying Defendants' motion to dismiss in most respects, see *Frederick L. v. Department of Public Welfare*, 157 F.Supp.2d

509 (E.D.Pa.2001), I certified this matter as a class action. Beginning May 20, 2002, and this matter was tried without a jury for three consecutive days. I enter the following Findings of Fact and Conclusions of Law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### I. BACKGROUND

#### A. Plaintiffs and the Class

There are four named plaintiffs in this case: Frederick L., Kevin C., Nina S., and Steven F. Each of the four individual plaintiffs is a current or former resident of NSH. (Stip.Nos.1 4.)[1] The four named plaintiffs bring this suit on behalf of the following class certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure:

> All persons institutionalized at Norristown State Hospital at any time after September 5, 2000 with the following exceptions: persons who, at the time of final adjudication, are: (1) confined in the Regional Forensic Unit and Juvenile Forensic Unit; (2) are involuntarily committed pursuant to 50 PA. CONS.STAT. ANN. § 7304(g)(2); (3) have criminal charges pending who have been found to be incompetent to stand trial; or (4) otherwise are subject to the jurisdiction of the criminal courts.[2]

NSH residents, including the named plaintiffs and class members, have serious and persistent mental illnesses. Some NSH residents[3] also have brain injuries, mental retardation, and physical impairments such as seizure disorders. (Stip. No. 6.) It is beyond dispute that these disabilities substantially limit one or more major life activities. (Id.) At the time of trial, there were approximately three hundred class members. (Tr. at 1:62.)

#### B. Defendant DPW

An agency of the Commonwealth of Pennsylvania, DPW is responsible, *inter alia*, for a variety of programs aimed at providing publicly funded mental health care. More specifically, Pennsylvania's system of publicly funded mental health care rests on the statutory structure established under the Mental Health and Mental Retardation Act of 1966 ("MH/MR Act"), 50 PA. CONS.STAT. ANN § 4101, *et seq.* Broadly speaking, the MH/MR Act requires DPW "[t]o assure within the State the availability and equitable provision of adequate mental health ... services for all persons who need them." 50 PA. CONS. STAT. ANN. § 4201(1). DPW receives federal financial assistance, including federal funding for mental health services in the community and at NSH. (Stip. No. 10.)

Within DPW, the Office of Mental Health and Substance Abuse Services ("OMHSAS") is responsible for the provision of mental health services. OMHSAS, in collaboration with other appropriate state and county offices, endeavors to ensure local access to an array of mental health and substance abuse treatment and services that are effectively managed,

---

1. In their Joint Pretrial Stipulation filed on May 6, 2002, the parties set forth a numbered list of facts that are not in dispute. These stipulations are referred to as "Stip. No. ___" herein.

   In addition, I note that by the time of trial, all four named plaintiffs had been discharged from NSH to community-based programs.

(Stip.Nos.1–4.) Nina S. was later readmitted to NSH.

2. I certified this matter as a class action in an Order dated November 21, 2001.

3. Unless otherwise noted, the NSH residents referred to herein are the named plaintiffs and those residents who comprise the class.

coordinated, and responsive to a changing healthcare environment. (Stip. No. 9.)[4]

## II. SERVICES AVAILABLE TO PENNSYLVANIANS WITH MENTAL ILLNESS

### A. Institutional Services at NSH

In Pennsylvania, individuals with mental disabilities are provided services in many settings, ranging from independent living arrangements, where the individual may reside alone, to institutional psychiatric facilities such as NSH.[5] Situated on a 233–acre campus approximately two miles from downtown Norristown in Montgomery County, NSH is one of these psychiatric facilities, serving the five southeastern Pennsylvania counties: Bucks, Chester, Delaware, Montgomery, and Philadelphia. (Stip.Nos.40, 43.) NSH patients have at least one serious and persistent mental illness. (Stip. No. 6.) Approximately fifty-two percent of NSH patients have schizophrenia, over thirty percent have schizoaffective disorder, and a relatively limited number have been diagnosed with other psychiatric conditions. (Tr. at 1:25; Pls.' Ex. 5.)[6]

Each of the five counties served by NSH has entered into a Continuity of Care Letter of Agreement with NSH, outlining the respective responsibilities of the counties and NSH for pre-admission, admission, joint treatment and monitoring, and discharge planning. (Stip. No. 46.) In accordance with the letters of agreement, NSH's Community Clinical Assessment Team and the respective county program offices review all referrals for admission to NSH. (Stip. No. 47.) In determining whether to admit an individual to NSH, they consider treatment recommendations, community treatment alternatives, and anticipated discharge needs. (*Id.*) Following admission, multi-disciplinary professional assessments are compiled for each resident, taking into account the particular resident's reasons for hospitalization, risk factors, medical needs, pre-discharge treatment needs, and post-hospital service needs. (Stip. No. 51.) This composite assessment serves as the basis for the patient's Individualized Treatment Plan ("ITP") which is overseen by a Treatment Team headed by a psychiatrist. (Stip. Nos. 51–52.) In accordance with the ITPs, NSH residents receive some or all of the following services: psychiatric, medical, and dental care and treatment; nursing care and treatment; psychological services; therapeutic recreation programs; social work services; occupational therapy; physical therapy; education services for individuals under the age of twenty-two; vocational services; and nutritional services. (Stip. No. 53.) Patients at NSH may receive visits from family members and friends during scheduled visiting hours. (Stip. No. 55.) In addition, NSH residents may leave the hospital campus for a variety of reasons. Depending on their clinical and "privilege" status, certain residents may leave the campus for individual and group outings. (Stip. No. 56.) Approximately sixty percent of civil pa-

4. The declining state hospital population is an important aspect of this changing healthcare environment. In the 1950s, Pennsylvania housed approximately 40,000 people in its state mental hospitals; at the time of trial, fewer than three thousand patients were housed in the ten remaining OMHSAS-operated facilities. (Defs.' Ex. 1, at 14.)

5. DPW, through OHMSAS, operates ten psychiatric facilities located throughout Pennsylvania. (Stip.Nos.37–39.)

6. Plaintiffs do not contend that the illnesses of class members have been misdiagnosed, or that the professional staff at NSH lack proper credentials or are unqualified to practice their respective professions. (Stip.Nos.49–50.)

tients are allowed to leave the NSH campus with supervision. (Tr. at 1:58.)

The patient population in the civil section at NSH falls into two categories: those who have been hospitalized for less than two years, and those who have been hospitalized for more than two years. For those in the former category, approximately thirty-two percent of the total population, the average length of stay is 10 months; for those in the latter category, the remaining sixty-eight percent of the population, the average length of stay is 12.5 years. (Tr. at 1:44–45.) Among the NSH long-stay population there are a limited number of patients who have been hospitalized for decades. (Tr. at 3:87.)

### B. Community–Based Mental Health Services

#### 1. Overview of Community–Based Health Services in Pennsylvania

Over 200,000 Pennsylvanians with mental illness have received some type of community mental health services funded by the Commonwealth. (Stip. No. 62.) Moreover, there is significant demand for additional community-based services in southeastern Pennsylvania. (Tr. at 1:154–55, 177–78, 206–07.) In this regard, DPW has recognized that "[e]valuations of persons in state hospitals show that a substantial percentage of the persons could be treated and served through community-

based services, if they were available." (Stip. No. 12.)

The parties agree that the availability of community mental health services is important for the successful provision of services to individuals with mental illness. (Stip. No. 65.) Under the MH/MR Act, Pennsylvania counties are responsible for developing an array of community mental health services. *See* 50 PA. CONS.STAT. ANN. § 4301(d). Thus, in addition to the services provided at NSH, community mental health services funded by the Commonwealth may be available to certain Pennsylvanians with mental illness. In the five southeastern Pennsylvania counties, residential mental health services funded by the Commonwealth include some or all of the following: supported and independent living programs; community residential rehabilitation programs ("CRRs"), which can vary in the amount of staff assistance provided; specialized group home-type settings that serve individuals with concurrent disorders or disabilities; and long-term structured residences ("LTSRs").[7] (Stip. No. 63.)

Aside from residential programs, in the five southeastern Pennsylvania counties, the Commonwealth also funds an array of non-residential mental health services, including: acute inpatient and extended acute inpatient; partial hospitalization; crisis assessment and intervention; psychosocial rehabilitation; vocational services; intensive case management; peer

---

7. Despite being community placements, in certain respects LTSRs resemble state hospitals. For example, both are highly secure, locked facilities, to which individuals may be involuntarily committed, offering care and treatment on a round-the-clock basis, with similar protocols for developing and reviewing treatment plans, and with on-site programming. (Tr. at 1:98,102; 3:3–8.) Plaintiffs' experts, Drs. Vergare and Klugheit opined that a number of NSH patients could be served in LTSRs. Because NSH patients

and LTSR residents all are, by definition, in need of close care (Tr. at 1:122), any difference among them is de minimis for ADA purposes. Thus, NSH patients appropriate for discharge to an LTSR do not have a viable claim for immediate community placement. *See Olmstead v. L.C.,* 527 U.S. 581, 604, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) ("[T]he ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk").

support; and family support. Not every type of program is available in every county. (Stip. No. 64.)

The rate at which Pennsylvania utilizes state mental hospital beds (Defs.' Ex. 2, at 6) compares favorably to Maryland's, which has been found to be consistent with ADA requirements. *See Williams v. Wasserman,* 164 F.Supp.2d 591, 636–37 (D.Md. 2001). Similarly, the rate of community placement in southeastern Pennsylvania is comparable to that in Western Massachusetts, which is regarded as a model system for placing people with mental illness in community settings. (Defs.' Ex. 12, at 8.)

### 2. CHIPP/SIPP

Along with other mental health programs, DPW funds the Community Hospital Integration Projects Program ("CHIPP"). CHIPP "was designed to promote the discharge of persons with long-term histories of hospitalization or complex service needs who had not previously succeeded in the community." (Stip. No. 139.) The Southeast Integration Projects Program ("SIPP"), is similar to CHIPP and "has an additional focus of addressing the issues specific to the five southeastern counties." (Defs.' Ex. 1, at 18.) Through the CHIPP/SIPP mechanism, DPW allocates funding to a particular county or counties for the specific purpose of developing the resources necessary to discharge residents of those counties from state psychiatric facilities. (Stip. No. 81.) For each community CHIPP/SIPP "slot," a state hospital bed must be closed. (*Id.*)

Amounts allocated to the counties under the CHIPP/SIPP program are negotiated by OMHSAS and the counties, after the counties submit proposals. The amount of savings that will be realized as hospital

beds are closed is a major factor in these negotiations. In order to realize sufficient savings, it may be necessary to close wards and decrease staffing. (Tr. at 2:183; 3:48.)

The parties agree that CHIPP/SIPP has facilitated and accelerated the process of discharging people from state institutions, downsizing state institutions, and developing community services. (Stip. No. 82.) DPW regards CHIPP/SIPP as "a critical component of [its] state hospital downsizing initiative and its expansion supports [DPW's] commitment to planned institutional downsizing." (Stip. No. 83.) Through the 2001–02 Fiscal Year, a total of 2,170 state hospital beds have been closed as a result of CHIPP/SIPP. (Defs' Ex. 2, at 11.)

## III.  DISCHARGE FROM NSH

### A.  Resident–Specific Discharge Planning and Preparation

Discharge planning begins at the time a patient is admitted to NSH, if not earlier. (Tr. at 1:54.) This planning process is undertaken by the patient's Treatment Team which ultimately decides whether he or she should be discharged from NSH. (Tr. at 1:77.) In reaching the decision that an individual should be discharged from NSH, the Treatment Team often seeks input from other sources, including representatives of the appropriate county program offices who also conduct assessments of NSH patient's readiness for discharge. (Stip. No. 21.)[8]

At any given time, there are some patients hospitalized at NSH who are considered by their Treatment Teams to be sufficiently stable to be placed in community-based programs. At the time of trial, approximately one third of NSH residents were considered appropriate for discharge.

8.  *See* Defs.' Rev. Finding of Fact No. 75.

(Tr. at 1:62.) Furthermore, because individual circumstances may change, a patient who is considered ready for discharge at one particular time may later. be deemed to be unfit for discharge. (Tr. at 1:17, 66, 93–94.) Citing the fact that a patients' readiness for discharge may change and the principle that discharge planning is an individualized process, NSH has decided not to maintain a comprehensive list of patients who have been determined ready for discharge. (Tr. at 1:80; 3:83.)

While every civil patient at NSH is a potential candidate for eventual discharge (Tr. at 1:18; 3:73), patients must make progress clinically before it is realistic to consider discharge. Any of a variety of circumstances—such as submission of an Active Discharge form by a patient's Treatment Team, or general Treatment Team discussion, or referral by an advocate, family member, or even self-referral—may result in an individual being considered for discharge at a planning meeting. (Tr. at 1:30–31; 3:72; Defs.' Ex. 8.)

NSH holds discharge planning meetings monthly; during these meetings, hospital staff and county representatives address discharge plans for specific individuals and unresolved impediments to discharge. (Stip. No. 22.) Other participants at these meetings include a social work supervisor, psychiatrists, patient advocates, and some community program providers. (Tr. at 3:74–75.) In planning for discharges from NSH, county representatives work closely with NSH's social work staff, informing them when vacancies arise or are expected

to arise. (Tr. at 1:115, 228, 235; 3:70.) Both for new and existing programs, information about patients suitable for discharge is forwarded to the particular program provider for determination regarding whether the patient should placed in that program. (Tr. at 1:114; 3:76–79.)

## B. Opposition to Discharge

For a variety of reasons, some patients oppose being discharged from NSH. (Stip. No. 23.) Because vacancies in appropriate programs are limited and because some patients express resistance to their discharge from NSH, the amount of time that elapses between when a patient is identified as ready for discharge and when that person is actually discharged varies considerably. (Tr. at 1:234–35.) Nevertheless, opposition to discharge can be overcome in most cases, and NSH has consistently discharged more patients than it admits. (Stip. No. 24; Tr. at 1:40–41.) [9]

## C. Comprehensive Planning for Discharges from NSH

In furtherance of the goal of making more community-based services available, OMHSAS has engaged in ongoing planning efforts. (Tr. at 1:107, 109–10; 2:149, 152, 235, 239.) Since 1994, the Southeast Task Force, comprised of the administrators of the County Mental Health and Mental Retardation Programs ("County MH/MR Programs"), psychiatrists, advocates, family members, and patients, has been engaged in the process of "developing a five-year plan for the operation and utilization of [NSH and Haverford State Hos-

9. Plaintiffs have attempted to show that NSH residents, once sufficiently stable to leave NSH, are then forced to wait an excessively long period of time before being discharged. See Pl.Ex. 41A. Because there may be special circumstances which delay any given resident's discharge from NSH, it is difficult, if not impossible, to generalize about the appropriateness of waiting periods. In any event, Plaintiffs have not shown that the time that elapses between a resident's discharge referral and actual date of discharge is due to any inaction on the part of NSH staff.

pital] with the specific objective of further integrating the resources of these facilities with community mental health programs...." (Stip.Nos.125–26.) Although these planning efforts should not be discounted entirely, Defendants have not demonstrated that they have a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings. At trial, one of Defendants' witnesses, Gerald Radke, Deputy Secretary for OMHSAS, admitted such a plan is not in place. (Tr. at 2:256.)

## IV. FUNDING AND BUDGETARY CONSIDERATIONS

### A. Pennsylvania's Budget Process

The Commonwealth provides the bulk of the funding for state-operated psychiatric hospitals. For example, in Fiscal Year 2001–02, over eighty percent of the funding for the state-operated facilities came from the Commonwealth. (Stip. No. 37.) Furthermore, the Commonwealth is responsible for ninety percent of the costs of many community-based health services, with the counties responsible for the remaining costs. (Stip. No. 59.) For certain programs, such as CHIPP, the Commonwealth provides all funding. (*Id.*)

The parties characterize the process by which DPW receives funding from the Commonwealth as "very complex." (Stip. No. 68.) Annually, the Governor's Office of the Budget issues Program Policy Guidelines ("PPGs") that instruct agencies with respect to the percentage increase they may request in their "carryforward" budgets. (Stip. No. 69.) The carryforward budget requests allow for the continued funding of programs already in exis-

tence. (Stip. No. 69(a).) In addition, the PPGs indicate certain spending priorities that the Governor seeks to address through Program Revision Requests ("PRRs"); PRRs are the means by which agencies seek new or expanded funding. (Stip. No. 69(b).) OMHSAS annually submits a proposed budget to DPW. DPW reviews the proposed budget and, after any modifications, submits it to the Governor's Office of the Budget for approval. (Stip. No. 72.) Regarding DPW's funds in general, there is no discretionary fund available to DPW that is not appropriated for a specific purpose. (Tr. at 2:132–135.) In addition, DPW generally does not have authority to transfer money from one legislative appropriation to another.[10] (Tr. at 2:191.) In an aggressive effort to expand community mental health services, DPW has submitted numerous requests for additional funding in various forms, including requests for cost-of-living adjustments and PRRs. (Stip. Nos. 71, 98; Tr. at 1:172; 1:210–11, 219; 2:137, 242–44.)

### B. Funding Community Mental Health Services

In Pennsylvania, there are three state funding streams for community mental health services for adults: (1) the "base allocation" made pursuant to the needs-based planning process; (2) CHIPP/SIPP funding; and (3) Medical Assistance/HealthChoices behavioral health services. (Tr. at 1:171–72.)

### 1. County Budget Allocations

The County MH/MR Programs annually develop and submit plans to DPW that include an assessment of needs for commu-

**10.** The Legislature makes a single appropriation to DPW for mental health services, combining institutional and community services. (Stip. No. 67.) Within that appropriation, DPW has discretion to shift mental health funding from institutional services to community-based services. (*Id.*) These funding shifts, however, require the Governor's approval. (Tr. at 2:191–194.)

nity mental health services and budget requests that reflect the amount of funding needed to provide adequate mental health services to county residents. (Stip. Nos. 74, 76.) Such requests include budgets for the continuation of existing programs, and, if the counties choose, separate budgets for expansion projects, namely adding new types of programs and/or enhancing or increasing existing program types, and/or for CHIPP/SIPP projects. (Stip. No. 75.) The funding allocated by DPW in response to the counties' plans—excluding new CHIPP/SIPP projects—is known as the "base allocation." (Stip. No. 77.)

DPW has not always requested funding from the Governor for the full amount of the annual mental health budget requests submitted by the County MH/MR Programs. (Stip. Nos. 71, 78.) Consequently, DPW's allocations to the County MH/MR Programs for mental health services have been less than the amounts the counties have requested in their annual mental health budgets. (Stip. No. 79; Tr. at 1:151–52, 1:154–56, 1:203.) Essentially, the allocations made by DPW to the County MH/MR Programs fund only the maintenance or carryforward budget; DPW has not allocated funds to the counties for their expansion proposals, except through CHIPP/SIPP. (Stip. No. 80.)

DPW submitted a PRR for FY 2000–01 to provide funding for increased base allocations to certain County MH/MR Programs in an effort to expand their community mental health services. (Stip. No. 98.) The PRR requested $6 million in annualized funding for nine County MH/MR Programs to augment their needs-based budget. The Governor's Office rejected this PRR. (Stip. No. 98(b).) In addition, OMHSAS developed a PRR for FY 2002–03 for funding for psychosocial rehabilitation services. DPW initially approved the PRR for submission, but withdrew it when the Governor's Office advised DPW there was no funding to support it. (Stip. No. 113.)

Given that funds to be allocated to the counties are limited, OMHSAS has at times suggested that counties "reprioritize" within their existing budgets (Tr. at 1:204–05, 211.) Even without urging from OMHSAS, Philadelphia County does this regularly, to be sure funds are expended as wisely as possible. (Tr. 1:211–13.)

## 2. CHIPP/SIPP Funding

DPW's funding requests with respect to CHIPP/SIPP are cumulative and, once made, CHIPP/SIPP commitments are ongoing. (Defs.' Ex. 1, at 18–21; Defs.' Ex. 2, at 11–14.) Put differently, one year's new CHIPP/SIPP allocation becomes part of the following year's carryforward budget. (Tr. at 2:29–30; Defs.' Ex. 3, at 2.)

Defendants admit that DPW's CHIPP/SIPP PRRs have not included requests for all the funding that would be required to fund, in full, all CHIPP/SIPP proposals submitted by county MH/MR programs. (Stip. No. 86.) Defendants point out, however, that CHIPP/SIPP expenditures have risen steadily, to a cumulative total of more than $155 million as of the end of this fiscal year. (Defs.' Ex. 2, at 11–14.) When the CHIPP program began, it did not require additional funding beyond what OMHSAS received for maintenance of existing programs; it was possible to completely fund CHIPP placements using the savings achieved by closing state hospital beds. (Tr. at 3:49.) In recent years, however, this has not been possible. As hospitals have become smaller, the savings associated with bed closures have become proportionately smaller because some fixed costs remain unchanged, regardless of hospital size. (Tr. at 2:57, 90, 248.) DPW has therefore requested additional CHIPP/SIPP funding through PRRs. (Stip. No. 85.; Pls.' Exs. 11–13.)

### 3. Other Expenditures

Pennsylvania participates in the joint federal-state Medical Assistance program, which funds various mental health and substance abuse services for eligible recipients. Beginning in southeastern Pennsylvania in 1997, DPW switched from a fee-for-service system to pay for Medical Assistance behavioral health services to a mandatory managed care system known as HealthChoices Behavioral Health ("HealthChoices BH"), which now applies to most Pennsylvania Medical Assistance recipients. (Stip. No. 90.) Under Health-Choices BH in southeastern Pennsylvania, DPW contracts with the counties to provide Medical Assistance behavioral health services, either directly or through a sub-contract with a private managed care organization. (Stip. No. 91.)

HealthChoices BH funds alternative forms of community mental health services, including private inpatient care; outpatient services; partial hospitalization; case management; crisis services; and resource coordination. HealthChoices BH does not fund adult residential mental health services. (Stip. No. 94.)

## V. ACCELERATING RATE OF COM-MUNITY PLACEMENTS FROM NSH

The patients currently hospitalized in NSH tend to have multiple problems and complicated needs. As a result, existing community residential programs would be inappropriate for many residents; developing new programs for these individuals will be time-consuming. (Tr. at 1:28, 177–78, 206–07.) For those patients who could be served in existing programs, it is difficult to set a fixed timetable for discharge in advance due to difficulties in predicting providers' decisions on individual applications when program vacancies will arise. (Tr. at 1:224–25; 3:94–95.)

It has not been demonstrated that discharging individuals at a faster pace from NSH would result in cost savings. As long as a hospital remains open, fixed costs must still be paid. Whatever savings are realized when hospital patients are discharged are comparatively less now that hospitals are smaller than they were a number of years ago. (Tr. at 2:87.) In addition, the costs of developing new community-based programs begin to accrue, and begin to be paid, during a lengthy development phase, while the individuals who eventually will move to community residences continue to receive hospital care and treatment. (Tr. at 1:193, 230–31.) Consequently, for a significant period of time, DPW, through the counties, may be forced to simultaneously pay both hospital costs and new program costs for the same individuals.

Along with funding considerations, there are other obstacles to developing new community programs at a quicker pacer. It takes time to overcome opposition from potential neighbors to new facilities and to recruit and train staff. (Tr. at 1:222, 226–27.) As Sandra Vasko, Mental Health Administrator for Operations for the Office of Mental Health of Philadelphia County testified, the recent creation of sixty new, specialized community residential slots "pushed the limits on what the five counties could handle." (Tr. at 1:221–22.)

Lastly, as Secretary Radke testified, accelerating the rate of discharges to the community would lead to inequitable results:

> [W]e would move a patient from the hospital to the community. We would notify the community that we were making a discharge.
>
> * * *
>
> [T]hen we would take the savings that came from closing that bed and give it to

the county and since that savings is not sufficient to meet what the county's estimate of need would be, we would tell the county to take [resources] from somebody who is not in the class and make it available to persons who are in the class.

\* \* \*

[If] we got to the point ... where there was just nothing in the county program, then we would start taking away form [sic] other county programs and we would go outside of [southeastern Pennsylvania] and start taking away from other parts of the state.

(Tr. at 2:249–50.)

### CONCLUSIONS OF LAW

This case arises under Title II of the ADA and § 504 of the Rehabilitation Act. Named Plaintiffs and the Class have impairments that substantially limit one or more of their major life activities, and, therefore, are disabled within the meaning of 42 U.S.C. § 12102(2)(A). DPW is both a "public entity" subject to Title II of the ADA, see 42 U.S.C. § 12131(1)(B), and a "program or activity receiving Federal financial assistance" subject to § 504, see 29 U.S.C. §§ 794(a), 794(b)(1).

I have previously addressed a number of legal issues in this case. Specifically, I have found that Defendants DPW and Houstoun have waived their sovereign immunity to suit under the Rehabilitation Act. *See Frederick L.*, 157 F.Supp.2d at 516–23. I have also held that Plaintiffs' ADA claims against Defendant DPW are barred by the Eleventh Amendment. *See Frederick L.*, 157 F.Supp.2d at 523–30. However, Plaintiffs' ADA and Rehabilitation Act claims against Defendant Houstoun in her official capacity are not barred by the Eleventh Amendment and can proceed under *Ex parte Young* doctrine. *Id.* at 531–32; *see also Koslow v. Pennsylvania*, 302 F.3d 161, 178–80 (3d Cir.2002) (finding ADA claim for prospective injunctive relief against state official authorized by *Ex parte Young* doctrine).

### I. ADA AND § 504 INTEGRATION MANDATE

Congress enacted the ADA in 1990 to bar disability-based discrimination by employers, public accommodations, and public entities such as state governments. *See* 42 U.S.C. §§ 12101–12213. Rather than delineating the specific forms of discrimination in Title II of the ADA, which applies to public entities, Congress directed the Department of Justice ("DOJ") to promulgate regulations that would be consistent with the § 504 coordination regulations. *See* 42 U.S.C. §§ 12134(a)-(b). Adhering to the congressional mandate in 42 U.S.C. § 12134(b), DOJ promulgated regulations under Title II of the ADA that were virtually identical to the § 504 coordination regulations. *See* 28 C.F.R. § 35.130. In particular, DOJ's ADA regulations included an explicit integration mandate, providing: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

In *Olmstead v. L.C.*, 527 U.S. 581, 604, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Supreme Court addressed the ADA's integration mandate, holding that unnecessary institutionalization and isolation of individuals with disabilities constitutes discrimination under the ADA. 527 U.S. at 600, 119 S.Ct. 2176; *see also Helen L. v. DiDario*, 46 F.3d 325, 333 (3d Cir. 1995) (interpreting ADA's integration mandate as requiring provision of community services to persons unnecessarily institutionalized); *Kathleen S. v. Dep't of Pub. Welfare*, 10 F.Supp.2d 460, 467–75 (E.D.Pa.1998) (holding that DPW violated

ADA's integration mandate by failing to provide community services to certain state hospital residents). Like the ADA, § 504 bars disability-based discrimination, see 29 U.S.C. § 794(a), and requires that recipients of federal financial assistance "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d). As I have previously concluded, the Rehabilitation Act requires that states provide community services to persons with mental illness when it is appropriate to do so. *See Frederick L.,* 157 F.Supp.2d at 534–36. Thus, for present purposes, the standards for assessing compliance the Rehabilitation Act's integration requirement are the same as those for assessing compliance with ADA's integration mandate. *See id.*[11]

## II. *OLMSTEAD* ANALYSIS

In large part, *Olmstead* provides the analytical framework under which Plaintiffs' claims must be considered. Under *Olmstead,* the ADA's proscription on discrimination may require placement of persons with mental disabilities in community settings, rather than in institutions, if three cumulative criteria are satisfied: (1) the state's treatment professionals have determined that community placement is appropriate; (2) the transfer from institutional care to a less restrictive setting is not opposed by the affected individual(s); and (3) it is possible for the placement(s) to be reasonably accommodated, "taking into account the resources available to the State and the needs of others with mental disabilities." 527 U.S. at 587, 119 S.Ct. 2176.

■ Plaintiffs request relief that requires Defendants to assure the development of community programs for a minimum of sixty NSH residents each year who, based on independent assessments, are determined to be appropriate for community placement, and that DPW provide the southeastern region with adequate funding for those programs. Plaintiffs estimate such relief would cost approximately $6.7 million a year.

### A. Discharge Readiness

The first *Olmstead* criterion relates to whether a state's treatment professionals have determined that community placement is appropriate. In this regard, the Supreme Court indicated that, in determining whether the ADA requires the placement of an individual in a community program, "the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program." 527 U.S. at 602, 119 S.Ct. 2176. That is, in considering the appropriateness of transferring a person to a community setting, the determinations of the treating medical professionals are entitled to deference. *See id.* at 610, 119 S.Ct. 2176 (Kennedy, J., concurring in judgment). Defendants admit that at any given time, NSH treatment professionals consider approximately one third of NSH's civil patients clinically stable and ready for discharge. At most, Plaintiffs, through their experts witnesses, have shown that there may be grounds for disagreeing with some of the conclu-

---

11. In addition to their integration mandate claims, which were the focus of the litigation and trial in this matter, Plaintiffs allege that Defendants use discriminatory methods of administration in violation of the ADA and § 504. *See* 28 C.F.R. § 35.130(b)(3)(i); 28 C.F.R. § 41.51(b)(3)(i). For the reasons discussed in connection with the integration mandate claims, I also find that Defendants' methods of administration do not discriminate against Plaintiffs.

sions reached by NSH treatment professionals. Plaintiffs, however, have not shown that NSH treatment professionals have rendered unreasonable opinions. Accordingly, and in deference to the reasonable opinions of NSH's staff, I conclude that approximately one third of Plaintiffs have satisfied the first *Olmstead* requirement. To be entitled to relief, these Plantiffs must also meet the other two *Olmstead* requirements.

### B. Opposition to Discharge

The integration mandate does not require the state to transfer from institutional to community-based services individuals who are opposed to such a transfer, see *Olmstead,* 527 U.S. at 587, 119 S.Ct. 2176; there is no federal requirement that "community-based treatment be imposed on patients who do not desire it." *Id.* at 602, 119 S.Ct. 2176. It is undisputed that there are many NSH residents who are appropriate for placement who do not oppose discharge. Such individuals may be entitled to relief if their placement in the community can be reasonably accommodated.

### C. Reasonable Accommodation and Defendants' Fundamental Alteration Defense

As a plurality of the *Olmstead* Court concluded, states may defend against integration mandate claims if they can prove that the provision of community-based services would result in a fundamental alteration of their programs and activities. *See id.* at 603, 119 S.Ct. 2176. The *Olmstead* Court rejected a construction of the fundamental alteration defense that required

only a comparison of the cost of the community services for the plaintiffs with the state's budget, and declined to hold that relief that results in increased costs constitutes a fundamental alteration *per se. See id.* Instead, as the Court directed, I must consider whether such individuals "can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 587, 607, 119 S.Ct. 2176. To avoid liability, Defendants must succeed on this defense.[12]

"Sensibly construed, the fundamental-alteration component of the reasonable-modification regulation [allows] the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Olmstead,* 527 U.S. at 604, 119 S.Ct. 2176.[13] The "resources available to the State" refers to the state's mental health budget and nothing beyond that budget. *Id.* at 607, 119 S.Ct. 2176; *see also Williams v. Wasserman,* 164 F.Supp.2d 591, 636–37 (D.Md.2001) (finding that deinstitutionalization does not result in immediate cost savings to mental health budget).

Here, DPW's mental health budget consists of its mental health services appropriation and that portion of the Medical Assistance appropriation which covers the HealthChoices–Behavioral Health program. (Tr. at 2:122.) The process by which DPW's mental health budget is enacted by the legislature, including the pro-

---

12. Defendants appear to have conceded that "fundamental alteration" is a defense on which Defendants must carry the burden of proof. *See* Defs.' Mem. in Supp. of Summ. J. at 18. My analysis assumes that Defendants bear the burden of proof on this issue.

13. Justice Kennedy's concurring opinion in *Olmstead,* 527 U.S. at 615, 119 S.Ct. 2176, reflects agreement with the plurality's fundamental alteration analysis.

cess whereby executive officials within DPW and the Governor's office develop proposed budgets, is beyond judicial scrutiny. *See Bogan v. Scott–Harris,* 523 U.S. 44, 54–55, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) ("exercise of legislative discretion should not be inhibited by judicial interference"). This principle applies when only declarative or injunctive relief is sought. *See Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 732, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980).

In this case, the record as a whole convincingly demonstrates that, over time, DPW has used its mental health budget to establish more and more community-based programs, and DPW will continue to do so, to the extent possible given fiscal realities. However, it is also apparent that DPW's existing mental health budget is, and will continue to be, insufficient to enable all eligible individuals to receive community-based services as soon as their eligibility is confirmed. At issue, then, is how DPW utilizes those funds made available to it by the Legislature at the end of the budget-enactment process. Consequently, I must consider whether DPW is utilizing its mental health budget in a reasonable, responsible manner to provide community-based services, or, in the alternative, whether DPW may somehow redirect its available resources to accelerate the rate of community placements without fundamentally altering its programs.

I recognize that matters involving deinstitutionalization raise "complex medical, social and fiscal issues not easily addressed by litigation." *Williams,* 164 F.Supp.2d at 595. More particularly, "[t]he pace of 'downsizing' a State's institutions reflects both fiscal and policy choices that are difficult to make." *Id.* at 637. Furthermore, "[t]he State is entitled to wide discretion in adopting its own systems of cost analysis, and, if it chooses, to

allocate health care resources based on fixed and overhead costs for whole institutions and programs." *Olmstead,* 527 U.S. at 615, 119 S.Ct. 2176 (Kennedy, J., concurring in judgment). Even if cost savings may eventually be achieved through deinstitutionalization, the immediate extra cost, and the concomitant lack of immediate aggregate cost saving, is sufficient to establish that a "fundamental alteration" would be required if the relief sought by plaintiffs—accelerated community placements—were granted in this case. *See Williams,* 164 F.Supp.2d at 636–37.

I conclude that Defendants are doing what they can with the resources that are in fact available. *See Olmstead,* 527 U.S. at 597, 604, 607, 119 S.Ct. 2176. This conclusion is buttressed by the fact that Plaintiffs have not identified any viable source of funding for the relief they have requested. Simply, absent an increase in funding, there is no way for Defendants to provide the relief sought by Plaintiffs without depriving others of mental health care. Although NSH patients do have to wait for community placements, procedures are in place whereby patients who are ready for discharge are identified, and appropriate individualized discharge plans are developed for them by hospital staff and county representatives, who have no choice but to work within the limits of available, finite resources. Moreover, the evidence reveals that granting Plaintiffs the requested relief would cause scarce resources to be directed to services for Plaintiffs at the expense of services for other individuals with mental illness. Thus, taking into account the resources available to the Commonwealth and the needs of others with mental disabilities, Defendants have established their fundamental alteration defense, barring Plaintiffs from receiving the requested relief.

## CONCLUSION

Throughout the trial, I was impressed with the sincerity and concern of all the lawyers and participants in this litigation. Plaintiffs are fortunate insofar as the public servants who have chosen to work in OMHSAS did so not because they were merely seeking a job, but because of vital concern for persons with mental illness.

While the first two *Olmstead* requirements have been met for some, though not all, class members, Defendants have made the necessary showing that the requested modification would cause a fundamental alteration of the Commonwealth's services and programs. Defendants are painfully frustrated by their inability to carry out their mandate as quickly as they, or Plaintiffs, would prefer. This is frustrating to the Court as well.

An appropriate Order follows.

## ORDER

**AND NOW,** this 5th day of **September, 2002,** upon consideration of the parties' proposed findings of fact and conclusions of law, revised proposed findings of fact and conclusions of law, the responses thereto, and the evidence presented at trial, and for the foregoing reasons, it is hereby **ORDERED** that:

1. Judgment is entered in favor of Defendants and against Plaintiffs and the Plaintiff class.

2. The Clerk of Court is directed to close this case.