**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 15 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENCH CIRCUIT

---

KATHERINE FISHER; EARLEE
HEATH; KAROL LOY, on behalf of
themselves and all others similarly
situated,

      Plaintiffs - Appellants,

  v.

OKLAHOMA HEALTH CARE
AUTHORITY, Sued as: State of
Oklahoma, Oklahoma Health Care
Authority and Mike Fogarty, in his
capacity as CEO of the Oklahoma
Health Care Authority; MIKE
FOGARTY,

      Defendants - Appellees,
_____

OKLAHOMA DISABILITY LAW
CENTER, INC.,

      Amicus Curiae.

No. 02-5192

---

**Appeal from the United States District Court**
**for the N. District of Oklahoma**
**(D.C. No. 02-CV-762-P)**

---

Stephen F. Gold (Morris Bernstein, University of Tulsa Boesche Legal Clinic, Tulsa, Oklahoma, with him on the briefs), Philadelphia, Pennsylvania for the Plaintiffs-Appellants.

Andrew J. Tevington, Deputy General Counsel, Oklahoma Health Care Authority, Oklahoma City, Oklahoma for the Defendants-Appellees.

Kayla A. Bower and Joy J. Turner, Oklahoma Disability Law Center, Inc., Oklahoma City, Oklahoma, filed a brief for the Amicus-Curiae.

---

Before **LUCERO**, **BALDOCK,** and **O'BRIEN**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

Plaintiffs, three disabled individuals receiving state-funded medical care as part of Oklahoma's Home and Community-Based Services ("HCBS") Waiver Program, the "Advantage Program," ask us to decide whether the defendants, the Oklahoma Health Care Authority ("OHCA")—the state agency that administers the Medicaid program for Oklahoma—and Mike Fogarty, in his official capacity as CEO of the OHCA, are violating federal law by the manner in which they operate their HCBS program. Specifically, plaintiffs object to the defendants' recent decision to limit prescription medications for participants in the waiver program to five per month, irrespective of medical necessity, and seek declaratory and injunctive relief against the imposition of the five-prescription cap. Plaintiffs assert that due to their precarious medical and financial circumstances, imposition of the five-prescription cap will force them out of their communities and into

- 2 -

nursing homes in order to obtain the care that is medically necessary. The district court granted summary judgment to the defendants, holding that the plaintiffs could not maintain a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., because they are not presently institutionalized and face no risk of institutionalization. Because we conclude that the plaintiffs may have a meritorious ADA claim, we exercise jurisdiction under 28 U.S.C. § 1291, and reverse and remand for further consideration.

## I

Medicaid is a joint federal-state program designed to provide medical assistance to low-income families and individuals "to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396. Once a state enters into a partnership with the federal government, Congress requires the state to provide a minimum level of benefits known as the mandatory program. § 1396a(10)(A)(i); 42 C.F.R. §§ 440.210, .220. Mandatory services include nursing home care. 42 U.S.C. § 1396a(10)(A) (incorporating § 1396d(a)(4)(A)). Pharmacy benefits, the focus of the instant case, are not part of the mandatory program, and are considered an optional program under Title XIX. §§ 1396a(a)(10), 1396d(a)(12). Along with every other state, Oklahoma has elected to provide prescription drugs as part of its Medicaid program. Persons

institutionalized in nursing homes receive all the prescriptions that are medically necessary. Okla. Admin. Code. § 317:35-3-2(15)(B).

As an alternative to institutionalization, Congress provides for home and community-based services as part of an optional waiver program.[1] 42 U.S.C. § 1396n(c)(1). Once a state obtains a waiver, this program allows individuals who meet the level of care required for institutionalization in a nursing facility to live at home and receive state-funded medical care. Id. "[T]he department of Heath and Human Services (HHS) has a policy of encouraging States to take advantage of the waiver program, and often approves more waiver slots than a State ultimately uses." Olmstead v. Zimring, 527 U.S. 581, 601 (1999) (quotation omitted). To obtain a waiver, a state must certify that placement of an individual in a waiver program will be cost-neutral, meaning that costs for persons in the waiver program will be less than if those persons were in an institution.[2] § 1396n(c)(2)(D). Oklahoma obtained such a waiver from the federal government for its Advantage Program. Okla. Admin. Code. § 317:30-5-760.

_____

[1] The program is referred to as a "waiver" because, with express authorization by a federal agency, the state is exempted from certain Title XIX statutory requirements.

[2] In Oklahoma, it costs approximately $28,000 per year to provide care to a disabled individual in a nursing home, and $14,000 to provide care through the Home and Community Based Waiver program.

Oklahoma has elected to provide prescription benefits to Advantage participants as well as residents in nursing homes. Until recently, Advantage participants were entitled to an unlimited number of medically necessary prescriptions paid for by the state. However, in September 2002, the state notified participants that it would impose a cap of five prescriptions per month on Advantage participants, effective October 1, 2002, while continuing to provide unlimited prescriptions to patients in nursing facilities. This decision was based on a budgetary shortfall; defendants anticipated that capping the number of prescriptions available would save the state $3.2 million.

On the same day that the five-prescription cap came into effect, plaintiffs Katherine Fisher, Earlee Heath, and Karol Loy, participants in Oklahoma's Advantage program, filed suit in federal court against the OHCA and its CEO, Mike Fogarty. In their complaint, plaintiffs allege that defendants' five-prescription cap violates the integration requirements of the ADA, 42 U.S.C. § 12101 et seq., and section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, because it will force them out of their communities and into nursing homes in order to obtain the care that is medically necessary.[3] Plaintiffs further assert

---

[3] Plaintiffs' RA claim is essentially the same as their ADA claim. Regulations under both sections require defendants to administer "programs, and activities in the most integrated setting appropriate to the needs" of qualified individuals with disabilities. 28 C.F.R. § 35.130(d) (ADA); 28 C.F.R. § 41.51(d)

(continued...)

that the cap violates Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. All three plaintiffs meet the medical and financial requirements for nursing facility care and would be eligible for admission to a nursing home.

Earlee Heath is 73 years old, uses a wheelchair, and suffers from insulin-dependant diabetes, hypertension, asthma, congestive heart failure, residual bilateral paresis and deep-vein thrombosis. She uses a portable oxygen machine to assist her in breathing. She takes approximately sixteen prescription medications that cost a total of $839 per month, all of which are prescribed by her doctors, who monthly review and monitor them. Assuming that defendants pay for the five most expensive medications, plaintiffs contend that Heath will have to pay $256 per month for the remainder out of her monthly income of $313.

Katherine Fisher is 48 years old, uses a wheelchair, has suffered from cerebral palsy since birth, and has had two strokes that required hospitalization. Fisher takes approximately twenty-one medications that cost a total of $858 per month. Her treating physicians re-evaluate her medications on a monthly basis. Assuming that defendants pay for the five most expensive medications, plaintiffs

---

[3](...continued)
(RA). Because plaintiffs have asserted no right under the RA that is not equally protected by the ADA, and because the district court focused its analysis on the ADA claim, we primarily address the plaintiffs' ADA claim.

assert that Fisher, whose monthly income is $725, will have to pay $274 per month for the remainder.

Karol Loy is 46 years old, has difficulty walking and standing, and has acute mixed connective tissue disease with seizure disorder, residual from a stroke and cardiac malfunction. She has been hospitalized for two strokes and a heart attack. Loy takes twenty-four prescriptions daily that cost a total of $2,808 per month. Assuming that defendants pay for the five most expensive medications, plaintiffs claim that Loy will have to pay $644 per month, out of a monthly income of $547, for the remainder.

Defendants contest these figures. According to defendants, adjusting the schedule under which medication is purchased and eliminating drug interactions could reduce the amount plaintiffs would have to pay under the cap.[4] By rescheduling and eliminating drugs that have adverse interactions with other drugs defendants argue that Fisher's monthly cost could be reduced to $45–60 per month; Heath's monthly cost could be reduced to $25 per month; and Loy's monthly cost could be reduced to "an admittedly still high two hundred dollars."

---

[4] Defendants' assertion is that, because the Oklahoma Medicaid plan allows participants to obtain either one hundred units (pills) or a thirty-four day supply, plaintiffs could obtain three months' worth of pills at once by electing the one-hundred-units option, and stagger their prescriptions. This "rescheduling" would effectively allow plaintiffs to obtain three times as many prescriptions, assuming their most expensive drugs are taken no more than once a day.

(Appellees' Br. at 6.)  Because the plaintiffs do not contest these projected cost savings, we assume that defendants' projections are correct.

Plaintiffs filed a motion for a preliminary injunction, which the district court converted into a motion for a permanent injunction.  After receiving briefing and conducting a hearing on the matter, the district court granted summary judgment to the defendants, concluding that the plaintiffs could not maintain a claim under the ADA because they are not presently institutionalized and face no risk of institutionalization.  This appeal followed.

## II

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court."  Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."  Simms, 165 F.3d at 1326.

A party requesting a permanent injunction bears the burden of showing: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. Fed. Lands Legal Consortium ex rel. Robart Estate v. United States, 195 F.3d 1190, 1194 (10th Cir. 1999); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 546 n.12 (1987).

**A**

Under Title II of the ADA, a public entity may not discriminate against qualified individuals based on a disability:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.[5] Pursuant to congressional authority, the Attorney General issued regulations implementing provisions of Title II, including the discrimination proscription of § 12132. Olmstead, 527 U.S. at 591–92. Central to the instant case are two such regulations. The first, known as the "integration regulation" or "integration mandate," provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting

_____

[5] There is no dispute in the instant case as to whether the plaintiffs are qualified individuals with disabilities.

appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d) (emphasis added).[6]  In Olmstead, the Supreme Court construed the ADA's integration mandate and concluded that the discrimination forbidden under Title II of the ADA includes "[u]njustified isolation" of the disabled.  527 U.S. at 597.  Thus, "the ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled."  Helen L. v. DiDario, 46 F.3d 325, 333 (3d Cir. 1995).

Although public entities are required to "make reasonable modifications in policies, practices, or procedures" in order to avoid the discrimination inherent in the unjustified segregation of the disabled, the second regulation at issue, the so-called "fundamental alteration regulation," relieves a public entity of its duties under the ADA's integration mandate if "the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7) (emphasis added); see Townsend v. Quasim, 328 F.3d 511, 517–18 (9th Cir. 2003).  Thus, under Olmstead and the applicable ADA regulations, when treatment professionals have determined that community placement is appropriate for disabled individuals, those individuals do

---

[6]  Similarly, the RA prohibits discrimination by entities receiving federal funds. See 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d) (providing that programs and activities shall be administered "in the most integrated setting appropriate").

not oppose the placement, and the provision of services would not constitute a "fundamental alteration," states are required to place those individuals in community settings rather than institutions.[7] 527 U.S. at 601–03.

Arguing that the integration regulation, as interpreted in Olmstead, renders the imposition of the five-prescription cap a violation of the ADA because it will force them to enter nursing facilities in order to obtain necessary prescriptions, the plaintiffs sought declaratory and injunctive relief before the district court. Rejecting this argument, the district court held that Olmstead is "factually and materially distinguishable" from the instant case, in that, unlike the plaintiffs in Olmstead, Fisher, Heath, and Loy are not presently living in an institution and are free to remain in the community. Fisher v. Okla. Health Care Authority, No. 02CV-762P(C), slip op. at 6 (N.D. Okla. Oct. 31, 2002).

Upon de novo review, we conclude that the district court was incorrect in its reading of Olmstead and the integration mandate. First, there is nothing in the plain language of the regulations that limits protection to persons who are currently institutionalized. The integration regulation simply states that public entities are to provide "services, programs, and activities in the most integrated setting appropriate" for a qualified person with disabilities. 28 C.F.R.

---

[7] There is no dispute in the instant case as to whether community placement is appropriate for the plaintiffs.

- 11 -

§ 35.130(d). Those protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation. Second, while it is true that the plaintiffs in Olmstead were institutionalized at the time they brought their claim, nothing in the Olmstead decision supports a conclusion that institutionalization is a prerequisite to enforcement of the ADA's integration requirements. Although no circuit court appears to have addressed the issue, we find Makin v. Hawai'i, 114 F. Supp. 2d 1017 (D. Haw. 1999), to be instructive. In Makin, the district court rejected the argument that Olsmstead is inapplicable in situations where the plaintiffs are not institutionalized, observing that this argument is "misplaced since the only alternative for Plaintiffs presently is institutionalization if they seek treatment under the statute." Id. at 1033. We agree, and conclude that Olmstead does not imply that disabled persons who, by reason of a change in state policy, stand imperiled with segregation, may not bring a challenge to that state policy under the ADA's integration regulation without first submitting to institutionalization.

As we have elaborated, under Olmstead, the failure to provide Medicaid services in a community-based setting may constitute a form of discrimination. Because the OHCA does not allow the plaintiffs to receive services for which they are qualified unless they agree to enter a nursing home, the plaintiffs have

- 12 -

presented a genuine issue of material fact as to whether they can prove that the defendants have violated the integration requirement of Title II of the ADA. However, our conclusion that the five-prescription cap may violate the ADA's integration regulation does not end our inquiry, for "[t]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless," Olmstead, 527 U.S. at 603, and states are permitted "to resist modifications that entail a 'fundamenta[l] alter[ation]' of the State's services and programs," id. (quoting 28 C.F.R. § 35.130(b)(7)).

In expounding upon the meaning of "fundamental alteration," the Olmstead Court rejected a construction of the fundamental-alteration defense that required only a comparison of the cost of the community services for the plaintiffs with the state's budget. Rather, courts are to consider whether "in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with . . . disabilities." Id. at 603–04. With this standard in mind, we proceed to consider whether the plaintiffs have created a genuine issue of material fact as to whether elimination of the five-prescription cap would constitute a fundamental alteration.

Recognizing that the fundamental-alteration regulation can serve as a defense to the requirements of the integration regulation, the district court noted

two things: (1) the waiver program is optional; and (2) "[g]iven . . .the State financial crisis, . . . [d]efendants have made a reasonable move to reduce the optional program rather than eliminate it altogether as the State could." Fisher, No. 02CV-762P(C), slip op. at 7. Regarding the fact that the Advantage waiver program is optional, we note that, under Title II of the ADA, a state may not amend optional programs in such a way as to violate the integration mandate. See, e.g., Helen L., 46 F.3d. at 336,339 (requiring the requested community-based service, attendant care, even though it is an optional Medicaid service). Thus, the mere fact that a program is optional does not support a fundamental-alteration defense; rather, it merely begs the question whether provision of that service would constitute a fundamental alteration.

As to the second fundamental-alteration factor cited by the district court, that the decision "to reduce the optional program rather than eliminate it altogether" was "reasonable" because of the reality of Oklahoma's financial crisis, Fisher, No. 02CV-762P(C), slip op. at 7, we note that public entities have a defense when a modification "would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(d); that their actions were merely "reasonable" does not constitute a defense. Moreover, the fact that Oklahoma has a fiscal problem, by itself, does not lead to an automatic conclusion that preservation of unlimited medically-necessary prescription benefits for

- 14 -

participants in the Advantage program will result in a fundamental alteration. See Townsend, 328 F.3d at 520. In passing the ADA, Congress was clearly aware that "[w]hile the integration of people with disabilities will sometimes involve substantial short-term burdens, both financial and administrative, the long-range effects of integration will benefit society as a whole." H.R. Rep. No. 101-485, pt.3, at 50, reprinted in 1990 U.S.C.C.A.N. 445, 473. If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed.

The district court appears to have found Oklahoma's decision "reasonable," and, by implication, that the elimination of the five-prescription cap would constitute a fundamental alteration, because the alternative to the imposition of the five-prescription cap was to eliminate the entire HCBS Waiver program. However, there is no evidence in the record to suggest that the state considered eliminating the entire program. Fogarty testified that "[the] agency is absolutely committed to [the waiver] program . . . It's a program that's needed." (Joint App. at 124.) Given that the cost of institutional care is nearly double that of community-based care, it seems unlikely that the option cited by the district court, elimination of the waiver program, would have solved Oklahoma's fiscal crisis, because it could have served only to drive participants into nursing homes.

In opposing summary judgment below, the plaintiffs proffered a number of alternatives to the five-prescription-cap, such as requiring prior authorization for prescriptions or reducing nursing home payments by $160 per year per patient, as examples that would allow the state to save money while preserving unlimited prescription benefits for participants in the Advantage program. Thus, it is not clear from the record or the district court's summary analysis that the expenses involved in preserving unlimited prescriptions under the Advantage program will "in fact, compel cutbacks in services to other Medicaid recipients," Townsend, 328 F.3d at 520, or be "inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with . . . disabilities," Olmstead, 527 U.S. at 604. Nor is it clear why the preservation of a program as it has existed for years and as approved by the federal government would "fundamentally alter the nature" of the program. 28 C.F.R. § 35.130(b)(7). Plaintiffs are simply requesting that a service for which they would be eligible under an existing state program, unlimited medically necessary prescriptions, be provided in a community-based setting rather than a nursing home. They are not demanding a separate service or one not already provided by the state. See Townsend, 328 F.3d at 517 (noting the distinction between whether services will be provided and where services will be provided). Given that Oklahoma has, until recently, provided unlimited prescriptions to

participants in the Advantage program, and continues to do so for those living in nursing homes, receiving medically necessary prescriptions is clearly in the nature of Oklahoma's HCBS program.[8] The district court's cursory fundamental-alteration analysis cannot stand up to logical inquiry.

In sum, in granting summary judgment to the defendants on the plaintiffs' ADA claim, the district court made errors of law and ignored disputed issues of material fact. There are genuine issues of material fact concerning whether reasonable modifications to Oklahoma's program must be made under the ADA. If reasonable modifications are required, there are genuine issues of material fact concerning whether they would fundamentally alter the program. Thus, we remand the matter for further consideration.

**B**

The state argues on appeal that the plaintiffs are not entitled to declaratory or injunctive relief because they cannot show that they will be harmed by the five-prescription cap. Because plaintiffs can reduce the cost of their prescriptions through scheduling and discontinuance of drugs with harmful interactions, the OHCA argues, the plaintiffs will not suffer irreparable harm absent the issuance

---

[8] An inescapable irony of the decision to cap prescriptions for participants in the Advantage program is that, given that the cost of institutional care is approximately twice as high as community-based care, if the plaintiffs are indeed forced to enter a nursing home to obtain necessary medical services, any cost savings achieved by the prescription cap will be quickly eroded.

of an injunction.  On this point, the district court observed that "with appropriate scheduling of drug purchases, management of prescriptions to avoid drug interactions, and alternative community resources, Plaintiffs could completely avoid institutional care."  Fisher, No. 02CV-762P(C), slip op. at 6.

Under defendants' figures, plaintiff Loy will face out-of-pocket expenses of $200 per month, which defendants acknowledge to be "admittedly still high." (Appellees' Br. at 6.)  Given that Loy's income is limited to $547 per month, an extra $200 per month—36.6% of her income—in drug costs will place a severe burden on her finances and could easily force her to enter a nursing home.  Thus, there can be no question that plaintiff Loy will be irreparably harmed absent the issuance of an injunction.

Whether plaintiffs Fisher and Heath will be irreparably harmed under defendants' figures is a closer question.  Defendants assert that Fisher's expenses will be reduced to $60 per month,[9] and Heath's costs can be reduced to $25 per month.  Fisher's income is $725 a month, which means that her prescription expenses will constitute 8.28% of her income under defendants' projections. Although Heath's costs will be small under defendants' projections, so too is her

---

[9] Because this is an appeal from a summary judgment motion, we must view the facts in the light most favorable to the plaintiff; thus we assume that Fisher's expenses will fall at the high end of the $45–60 range projected by defendants.

- 18 -

income—$313 per month. Her prescription expenses will constitute about 8% of her income under defendants' projections. This may not be devastating, but it will likely have a real effect on Fisher's and Heath's finances given their poverty.

The state further argues that the plaintiffs cannot show that they will be harmed by the five-prescription cap because all three plaintiffs stated at a hearing conducted by the district court either that they would rather die than be placed in a nursing home, or that they would not enter a nursing home because they feared they "wouldn't last long" due to the fact that "they don't take care of people [there] any more." (Joint App. at 30.) By their own admission, the state argues, the plaintiffs do not face the segregation and isolation from the community that constitutes discrimination under the ADA. We note, however, that given the plaintiffs' precarious health and finances, the five-prescription cap places them at "high risk for premature entry into a nursing home." (Id. at 70.) That they have emphatically stated their desire to remain in the community does not mean that they do not face a substantial risk of harm. An expert witness testified that under the prescription cap, "some . . . would just choose to stay at home and die a premature death. Others will wait until their health has deteriorated and then there will be a hospital admission. Some will eventually end up in a nursing home." (Id. at 76.)

We conclude that plaintiffs have raised a genuine issue of material fact as to irreparable harm even if their expenses can be lowered as suggested by defendants.

## C

Plaintiffs make several arguments based on the Medicaid Act that were not included in their initial or amended complaint and were raised for the first time in their "Memorandum of Law in Opposition to Defendants' Motion to Dismiss and Supplemental Memorandum of Law in Support of their Motion for Injunctive and Declaratory Relief."[10] (Joint App. at 316.) Plaintiffs claim: (1) that defendants are bound by the terms of their HCBS waiver to offer equal prescription benefits to Advantage participants;[11] (2) that the Medicaid Act does not authorize a limitation on the number of prescriptions offered to HCBS participants; (3) that the five-prescription cap violates the Medicaid Act's "reasonable" and "medical

---

[10] In their initial complaint, plaintiffs raised a single Medicaid Act claim: that defendant Fogarty "violated Title XIX by failing to give plaintiffs adequate notice of their opportunity to request a hearing and continue to receive the same level of services if they file a timely appeal." (Joint App. at 142.) This notice argument is not now before us. Plaintiffs subsequently amended their complaint, but did not add any new Medicaid Act claims. Only after defendants moved to dismiss did plaintiffs make the Medicaid Act arguments that are now made to this court.

[11] The waiver states that "[t]he prescription drug policy for waiver recipients shall be the same as that for Medicaid clients needing Nursing Facility Level of Care and who are receiving that care in a Nursing Facility." (Appellants' Br., App. B.)

necessity" standards; and (4) that the cap violates the Act's "choice" and "health and welfare" requirements.

None of these arguments were ruled upon by the district court in its order.[12] Because plaintiffs did not make these claims in their initial complaint, raising them only in a subsequent "Supplemental Memorandum of Law," (Joint App. at 316), it is not clear that these arguments were properly raised in the district court. However, even if they were properly raised, we see no reason "to depart from the

---

[12] The district court observed in a footnote that, generally speaking, "when medical assistance is provided under the Medicaid program . . . benefits must be comparable among recipients. 42 U.S.C. § 1396a(a)(10)(B)." Fisher, No. 02CV-762P(C), slip op. at 5, n.2. However, noted the district court, the "Secretary of Health and Human Services . . . can waive the comparability requirement for programs such as the Home and Community-Based Waiver Program . . . [and] the Secretary waived this requirement for the State of Oklahoma. 42 U.S.C § 1396n(c)(3)." Id. Citing no authority, the defendants essentially argue that this waiver of comparability forecloses all of the plaintiffs' arguments under the Medicaid statute because the prescription benefits under the waiver program are not required to be comparable to those outside of the waiver program.

While the district court did not state what, if any, legal consequences flow from its observation, to the extent that the district court implicitly concluded that plaintiffs' arguments under the Medicaid statute are precluded by the waiver of comparability, that conclusion was incorrect. Simply put, comparability is not at issue. The plaintiffs' Medicaid claims do not hinge upon a comparison of benefits in and outside of the waiver program. Rather, they allege violations of the Medicaid statute in absolute terms. Although courts have understood the waiver of comparability to allow for "more stringent eligibility requirements for the waiver program than for Medicaid as a whole," Boulet v. Cellucci, 107 F. Supp. 2d 61, 76 (D. Mass. 2000) (emphasis added) (citing Skandalis v. Rowe, 14 F.3d 173, 181 (2d Cir. 1994)), we do not understand the waiver of comparability to give the state virtual carte blanche to disregard all the requirements of the Medicaid statute as to participants in a waiver program, or to amend the waiver program unilaterally once it has been approved by the federal government.

general rule that 'a federal appellate court does not consider an issue not passed upon below.'" Walker v. Mather, 959 F.2d 894, 896 (10th Cir. 1992) (quoting Singleton v. Wulff, 428 U.S. 106, 120 (1976)). We therefore remand to the district court to consider (1) whether these claims were properly raised, and, if so (2) whether plaintiffs are entitled to a permanent injunction on these claims.

## III

In sum, in granting summary judgment to the defendants on the plaintiffs' ADA claim, the district court relied on incorrect legal assumptions and ignored genuine issues of material fact. We therefore **REVERSE** the judgment of the district court granting summary judgment to the defendants and **REMAND** the matter for further proceedings consistent with this opinion.