

Opinions of the United
States Court of Appeals
for the Third Circuit

4-13-2004

# L. v. Dept Pub Welfare PA

Precedential or Non-Precedential: Precedential

Docket No. 02-3721

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"L. v. Dept Pub Welfare PA" (2004). *2004 Decisions*. Paper 749.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/749

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

—————

No. 02-3721

—————

FREDERICK L.; NINA S.; KEVIN C.;
STEVEN F., ON BEHALF OF
THEMSELVES AND ALL PERSONS
SIMILARLY SITUATED,

Appellants

v.

DEPARTMENT OF PUBLIC
WELFARE OF THE
COMMONWEALTH OF
PENNSYLVANIA; FEATHER O.
HOUSTOUN, IN HER OFFICIAL
CAPACITY AS SECRETARY OF
PUBLIC WELFARE FOR THE
COMMONWEALTH OF
PENNSYLVANIA

—————

On Appeal from the United States
District Court for the Eastern District of
Pennsylvania
(D.C. No. 00-cv-04510)
District Judge: Berle M. Schiller

—————

Argued October 15, 2003

Before: SLOVITER, ROTH, and
CHERTOFF, Circuit Judges

(Filed  April 13, 2004)

—————

Robert W. Meek
Mark J. Murphy   (Argued)
Robin Resnick
Disabilities Law Project
Philadelphia, PA 19107

Attorneys for Appellants

D. Michael Fisher
        Attorney General
Claudia M. Tesoro (Argued)
        Senior Deputy Attorney General
Calvin R. Koons
        Senior Deputy Attorney General
John G. Knorr, III
        Chief Deputy Attorney General
Office   of   Attorney   General   of
        Pennsylvania
Philadelphia, PA 19107

Attorneys for Appellees

Robert D. Fleischner
Center for Public Representation
Northampton, MA 01060

Attorney for Amici-Appellants

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellants represent a class of
mental health patients institutionalized in
the Norristown State Hospital, a large
congregate psychiatric hospital located in
southeast Pennsylvania, who are qualified
for and wish to be placed in a community-

care setting.[1] They seek declaratory and permanent injunctive relief to remedy what they claim are violations of their federal statutory rights to a more accelerated program of deinstitutionalization. They appeal from the judgment for the Commonwealth entered by the District Court following a bench trial. Appellants contend that the District Court erroneously interpreted the applicable legal principles. The issue raised is significant as it implicates the extent to which the state may rely on general cost concerns to avoid its statutory responsibility to eliminate disabilities discrimination.

## I.

### FACTS AND PROCEDURAL HISTORY

Appellants represent approximately 300 class members with serious and persistent mental disabilities who are institutionalized at Norristown State Hospital ("NSH"). Approximately 32% of the class members are classified as short-stay patients (approximately 10 months) and 68% of the class members are classified as long-stay patients (approximately 12 and a half years). Appellee Department of Public Welfare of the Commonwealth of Pennsylvania ("DPW") is an agency of the Commonwealth of Pennsylvania ("the Commonwealth") that provides publicly funded mental health care in institutional and community settings. Also named as a defendant is Feather O. Houston in her official capacity as Pennsylvania's Secretary of Public Welfare. The Office of Mental Health and Substance Abuse Services ("OMHSAS"), is a department of DPW that has the responsibility to ensure local access to mental health and substance abuse treatment. App. at 712. OMHSAS operates nine psychiatric facilities and one nursing facility throughout Pennsylvania. NSH is one such facility. App. at 717. Amici curiae represent fourteen former state mental health agency administrators and have submitted a brief in support of appellants.

Appellants filed this class action lawsuit in September 2000, claiming that, because the class members are qualified and prepared for community-based services, their continued institutionalization violates the anti-discrimination and integration mandates of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134 and

---

[1] The class includes all qualified and willing "persons institutionalized at Norristown State Hospital at any time after September 5, 2000 with the following exceptions: persons who, at the time of final adjudication, are: 1) confined in the Regional Forensic Unit and Juvenile Forensic Unit; 2) are involuntarily committed . . . ; 3) have criminal charges pending who have been found to be incompetent to stand trial; or 4) otherwise are subject to the jurisdiction of the criminal courts." App. at 711 (Jt. Stipulation).

2

28 C.F.R. § 35.130(d) (1998), and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d) (1998).[2] They claim that DPW has failed to provide services to them in the most integrated setting appropriate to their needs and has developed no plan to assure that this be done. They also claim that DPW has failed to require treatment teams to prepare appropriate individualized assessments of the service needs of the class members that are a prerequisite for community placement. In their answer, defendants admit some of the detailed allegations of the amended complaint and deny others. Essentially, defendants assert as an affirmative defense the analysis in Olmstead v. L.C., 527 U.S. 581 (1999), where a plurality of the Supreme Court allowed the states to resist modifications that would effect a fundamental alteration of the states' services and programs. Although Appellants acknowledge that the statutes would not require additional community placements if the increase would require a fundamental alteration of the Commonwealth's policy and budget, Appellants argue that the cost of providing the additional placements would be defrayed by cost-savings from bed closures in NSH. They further argue that cost

---

[2] The language and implementing regulations of the ADA and the RA are virtually the same and the parties acknowledge the congruence of their integration mandates. Frederick L. v. Dep't of Pub. Welfare, 217 F. Supp. 2d 581, 591 (E.D. Pa. 2002).

concerns alone do not provide the Commonwealth grounds for a fundamental-alteration defense to their claims.

On May 6, 2002, the parties filed extensive joint stipulations regarding the facts underlying this case. App. at 710-39. In pertinent part, they stated that between 1976 and 1998, DPW closed thirteen state-operated psychiatric facilities, including two facilities in southeastern Pennsylvania in 1990 and 1998. App. at 717.

The joint stipulations explain that one way in which DPW closed hospitals is by moving qualified patients into community care programs. In order to determine when a patient is ready for community care, NSH county program officers hold "monthly Hospital/County Discharge Planning meetings," at which staff and county representatives conduct "independent, ongoing assessments of each consumer's discharge readiness and aftercare needs," and address "unresolved impediments to discharge." App. at 715. However, NSH does not maintain formal waiting lists for community services. App. at 722.

The parties also stipulated that DPW receives the bulk of its mental health funding from the Commonwealth through a budgetary process set out in 71 P.S. §§ 229-240. App. at 723. Under Pa. Code § 4215.21, county programs must annually develop and submit to DWP and OMHSAS an assessment of needs for community-based mental health services

and budget estimates. App. at 724. OMHSAS submits a proposed budget to DPW, which can modify it, and DPW submits the budget to the Governor's Office of Budget. The Governor then formulates a comprehensive budget and submits it to the Legislature, which ultimately enacts DPW's budget. App. at 724.

DPW's primary funding mechanism for new community care placements has been the Community Hospital Integration Projects Program ("CHIPP") and the Southeastern Integration Projects Program ("SIPP"). App. at 15, 725. The number of community care placements has varied widely from year to year: 38 in 1996-97; 155 in 1997-98; 82 in 1998-99; 121 in 1999-2000; 43 in 2000-01; and 60 (proposed) in 2001-02. App. at 726-27.

The stipulations describe instances in which DPW did not request the full amount of mental health monies requested by the counties and instances in which DPW initially requested additional community placements, but the Governor informed DPW that no funding would be available or rejected the request. App. at 725, 729. However, apart from the budget process, DPW has funded 48 additional community care slots through savings in overtime. App. at 730.

Following a three-day bench trial in May 2002, the District Court issued a memorandum opinion on September 5, 2002 in favor of DPW. Frederick L. v. Dep't of Pub. Welfare, 217 F. Supp. 2d

581 (E.D. Pa. 2002). The District Court held that Appellants were not entitled to the requested relief because it would have required a fundamental alteration of the Commonwealth's programming and budgetary allocations. The District Court also found that providing additional community placements would have negatively affected other state residents with mental disabilities who received services in an institutional setting.

Appellants contend that the District Court erred by stating that the immediate extra cost coupled with a lack of immediate cost-savings associated with their requested relief, without more, provided DPW with a fundamental-alteration defense. Appellants further argue that the District Court erred in finding that DPW's pre-budgetary involvement in the legislative process was "beyond judicial scrutiny." Frederick L., 217 F. Supp. 2d at 593.

## II.

### DISCUSSION

We may set aside the District Court's conclusions of fact only for clear error, but we subject its conclusions of law to plenary review. See, e.g., Goldstein v. Johnson & Johnson, 251 F.3d 433, 441 (3d Cir. 2001).

### A. Statutory Framework

This case arises under Title II of the ADA and Section 504 of the RA. Title II

4

of the ADA provides that "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be denied the benefit of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA largely mirrors Section 504 of the RA, which states as follows:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). We have construed the provisions of the RA and the ADA in light of their close similarity of language and purpose. See Helen L. v. DiDario, 46 F.3d 325, 330-32 (3d Cir.), cert. denied, 516 U.S. 813 (1995).

The ADA and RA's anti-discrimination principles culminate in their integration mandates, which direct states to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities" is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. A, p. 450 (1998). In short, where appropriate for the patient, both the ADA and the RA favor integrated, community-based treatment over institutionalization. Significantly, none of the parties contests that proposition.

## B. Olmstead v. L.C.

The parties agree that this case is governed by the Supreme Court's decision in Olmstead v. L.C., 527 U.S. 581 (1999). In Olmstead, two mental health patients alleged that the State of Georgia violated the ADA integration mandate by unnecessarily segregating them in mental health institutions and failing to place them in community-based treatment programs. Id. at 593-94. The Court found that the ADA reflects the congressional conclusion that unjustified institutionalization perpetuates prejudice against mental health patients and severely diminishes their quality of life. Id. at 600-01. The Olmstead plurality held that, under certain circumstances, unnecessary institutionalization and segregation may constitute discrimination. Id. at 597.

Justice Ginsburg, writing for the

plurality,[3] emphasized that the integration mandate "is not boundless." Id. at 603. It is qualified by the "reasonable modifications" and "fundamental-alteration" clauses, which provide that:

> [a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the

modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7) (1998). In light of these qualifications, the plurality held that unnecessary institutionalization only violates the ADA when the following conditions are met:

> [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account [a] the resources available to the State and [b] the needs of others with mental disabilities.

Olmstead, 527 U.S. at 587. The Olmstead plurality thus made clear that a state may defend against disability discrimination claims by establishing that the requested community services would require a fundamental alteration of the state's mental health system. Id.[4]

---

[3] Justice Ginsburg's plurality opinion was joined by Justices O'Connor, Souter, and Breyer. Although Justice Kennedy concurred in the judgment of the Court, he wrote separately to explore the question of whether plaintiffs should have been required to prove that they had been treated differently than similarly-situated persons. See Olmstead, 527 U.S. at 611-15 (Kennedy, J., concurring). Justice Kennedy agreed with the plurality that States have a responsibility to provide community-based mental health services, but characterized the responsibility as a limited one and emphasized that States are entitled to considerable deference in allocating their budgets. Id. at 615. Justice Stevens also joined the judgment of the plurality, but did not believe the question was properly before the Court. See Olmstead, 527 U.S. at 607-08 (Stevens, J., concurring).

---

[4] Under this scheme, the plaintiff first bears the burden of articulating a reasonable accommodation. The burden of proof then shifts to the defendant, who

6

Here, the parties do not dispute that Appellants have satisfied the first two <u>Olmstead</u> requirements. The District Court found that one-third of the Appellants were qualified for community-based mental health services and an even larger portion of the class expressed affirmative interest in being placed in community-based care. The point of contention instead arises from the interpretation of <u>Olmstead</u>'s third prong regarding reasonable accommodation and the fundamental-alteration defense.

## C. Reasonable Modifications and the Fundamental-Alteration Defense

The <u>Olmstead</u> plurality explained the reasonable-modifications clause and fundamental-alteration defense as follows:

> Sensibly construed, the

fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.

<u>Id.</u> at 604. The plurality thus characterized the state's available resources and responsibility to other institutionalized mental health patients as primary considerations in evaluating a fundamental-alteration defense.

Although <u>Olmstead</u> permits courts to consider a state's financial burdens in evaluating the fundamental-alteration defense, the <u>Olmstead</u> plurality expressly proscribed two methods of cost-analysis. First, courts may not simply compare the cost of providing the plaintiffs with immediate relief against the entirety of the state's mental health budget because the state's mental health budget will almost always dwarf the requested relief. <u>Id.</u> at 603. Second, courts may not merely compare the cost of institutionalization against the cost of community-based health services because such a comparison would not account for the state's financial obligation to continue to operate partially

---

must establish that the requested relief would require an unduly burdensome or fundamental alteration of state policy in light of its economic resources and its obligations to other mentally ill persons in the institutional setting. Although Appellants argue that the District Court reversed the burden of proof by requiring Appellants to demonstrate that their requested relief did not require a fundamental alteration, this contention is belied by the fact that the District Court expressly acknowledged the appropriate burdens of proof in its memorandum opinion. <u>See</u> <u>Frederick L.</u>, 217 F. Supp. 2d at 592 n.12.

full institutions with fixed overhead costs. Id. at 604 n.15. It is notable for our purposes that the plurality did not envision the fundamental-alteration defense to be a rare one that states would seldom be able to invoke. See id. at 603 (eschewing formulation of fundamental-alteration defense as one permitted "only in the most limited of circumstances").

In his concurrence, Justice Kennedy underscored his opposition to judicial involvement in political and/or budgetary decisions outside the province of the law. He stated that federal courts should accord deference to state policymakers' programmatic and political funding decisions regarding mental health funding:

> No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities. If, for example, funds for care and treatment of the mentally ill, including the severely mentally ill, are reduced in order to support programs directed to the treatment and care of other disabilities, the decision may be unfortunate. The judgment, however, is a political one and not within the reach of the statute. Grave constitutional concerns are raised when a federal court is given the authority to review the

State's choices in basic matters such as establishing or declining to establish new programs. It is not reasonable to read the ADA to permit court intervention in these decisions.

Id. at 612-13 (Kennedy, J., concurring).[5] Justice Kennedy further stated that states have considerable latitude in analyzing the "comparative costs of treatment":

> The State is entitled to wide discretion in adopting its own systems of cost analysis, and, if it chooses, to allocate health care resources based on fixed and overhead costs for whole institutions and programs. We must be cautious when we seek to infer specific rules limiting States' choices when Congress has used only general language in the controlling statute.

Id. at 615 (Kennedy, J., concurring).

---

[5] Justice Kennedy further opined that a state without any community treatment programs in place would not be required to create such programs under the ADA. Id. at 613 (Kennedy, J., concurring). We express no opinion on this view.

**D. Needs of Other Mentally Ill Persons**

Olmstead explains that the ADA does not compel states to provide relief where the requested relief would require the state to neglect the needs of other segments of the mentally disabled population who are not litigants before the court. Id. at 597 (recognizing "States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand").

In addition, the plurality reasoned that a state may avoid liability by providing "a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace [and was] not controlled by the State's endeavors to keep its institutions fully populated." Id. at 605-06. It is this language that informs our decision in this case.

**III.**

**APPLICATION TO THIS CASE**

Appellants, along with Amici, argue that the District Court erroneously construed the fundamental-alteration defense with respect to three primary factors: 1) cost constraints and consideration of institutionalized persons; 2) past progress in deinstitutionalization; and 3) long-term planning for deinstitutionalization.

**A. Budget Constraints and Needs of Others**

As mentioned above, Olmstead directs courts to evaluate the fundamental-alteration defense in light of the state's resources and its responsibility to continue providing services to mental health patients other than those seeking community care.

The bulk of Appellants' objections have focused on the following statement in the "Conclusions of Law" section of the District Court's opinion:

> Even if cost savings may eventually be achieved through deinstitutionalization, the immediate extra cost, and the concomitant lack of immediate aggregate cost saving, is sufficient to establish that a "fundamental alteration" would be required if the relief sought by plaintiffs – accelerated community placements – were granted in this case.

Frederick L., 217 F. Supp. 2d at 593 (internal citations omitted). Appellants argue that the Commonwealth's articulation of additional costs that would attend deinstitutionalization does not automatically give rise to a fundamental-alteration defense. Furthermore, Appellants continue, these cost concerns

do not automatically make a requested modification unreasonable. In sum, Appellants urge that the Commonwealth's fiscal concerns, without more, cannot provide the sole basis for a fundamental-alteration defense. DPW acknowledges that government agencies frequently must spend money in order to meet their ADA and RA obligations, absent a windfall of cost-savings.

We have not previously considered the extent to which states may assert a fundamental-alteration defense based on fiscal concerns alone, but now hold that if the District Court's opinion is read as focusing only on immediate costs, as Appellants contend, it would be inconsistent with Olmstead and the governing statutes. First, Olmstead lists several factors that are relevant to the fundamental-alteration defense, including but not limited to the state's ability to continue meeting the needs of other institutionalized mental health patients for whom community placement is not appropriate, whether the state has a waiting list for community placements, and whether the state has developed a comprehensive plan to move eligible patients into community care settings. Olmstead, 527 U.S. at 605-06. The Court noted that Section 504 of the RA specifies that:

> [the fundamental-alteration and undue hardship] inquiry requires not simply an assessment of the cost of the accommodation in relation

to the recipient's overall budget, but a "case-by-case analysis weighing factors that include: (1)[t]he overall size of the recipient's program with respect to number of employees, number and type of facilities, and size of budget; (2)[t]he type of the recipient's operation, including the composition and structure of the recipient's workforce; and (3)[t]he nature and cost of the accommodation needed." 28 CFR § 42.511(c) (1998); see 45 CFR § 84.12(c) (1998) (same).

Id. at 606 n.16.

Second, at least one court of appeals and one district court have held that a singular focus upon a state's short-term fiscal constraints will not suffice to establish a fundamental-alteration defense. In Fisher v. Oklahoma Health Care Authority, 335 F.3d 1175 (10th Cir. 2003), the plaintiffs challenged the state's decision to limit the number of prescriptions provided for outpatients with disabilities who received Medical Assistance, irrespective of medical necessity, while it continued providing unlimited prescriptions to disabled in-patients in nursing homes. The Fisher plaintiffs argued that because the policy would require low-income disabled

10

persons to move to nursing homes in order to continue receiving full coverage of all of their prescriptions, the state had violated the ADA integration mandate. Id. at 1177-78. Oklahoma countered that granting plaintiffs' requested relief would have required a fundamental alteration in light of its fiscal crisis. Id. at 1178, 1182. The district court entered summary judgment against the plaintiffs because they were not currently institutionalized nor did they face a risk of institutionalization. Id. at 1181.

After holding that institutionalization was not a prerequisite to plaintiffs' ADA claim, the Court of Appeals for the Tenth Circuit rejected the state's fundamental-alteration defense, stating that Oklahoma's fiscal problems did not establish a per se fundamental-alteration defense. Id. at 1182. The court reviewed the legislative history of the ADA and concluded that Congress contemplated that states sometimes would be required to make short-term financial outlays, even in the face of mounting fiscal problems. Id. at 1183. The court thus decided that such financial obligations did not automatically relieve the state from meeting Congress' integration mandate. Id. Because the court found that the plaintiffs may have had a meritorious claim under the ADA, it reversed the district court's grant of summary judgment and remanded for consideration of whether the plaintiffs' requested modifications would fundamentally alter the program. Id. at 1186.

Similarly, in Makin v. Hawaii, 114

F. Supp. 2d 1017 (D. Haw. 1999), a class of mentally retarded persons on a waiting list for Hawaii's community-based program sued the state for violations of the ADA and the RA, seeking additional community placements and the development of a program to encourage movement on the waiting list at a reasonable pace. Hawaii attempted to assert a fundamental-alteration defense based on the theory that increased community placements would require the state to ignore state and federal funding limits and alter its existing programs by establishing an "unlimited" state fund for community mental health services. Id. at 1034. The district court rejected the state's defense, noting that a potential funding problem, without more, did not give rise to a fundamental-alteration defense. Id. We agree with the Makin court and with Appellants that states cannot sustain a fundamental-alteration defense based solely upon the conclusory invocation of vaguely-defined fiscal constraints.

We do not read the District Court's opinion in this case as relying solely on the increased short-term costs that additional community placements would entail, notwithstanding the sentence in its opinion that suggests a lack of cost-savings alone will sustain Pennsylvania's fundamental-alteration defense. Although the court noted the absence of cost-savings and the requisite spending that new community placements would entail, it undertook more comprehensive analyses that focused upon DPW's unsuccessful attempts at fund

procurement through the Governor's budget. App. at 20-21. It recognized that DPW had submitted evidence that it had responsibly spent its budgetary allocation, re-allocated overtime savings to increase funding for community-based mental health services, and had a favorable bed closure rate when compared with western Massachusetts, which is considered to be a model region for deinstitutionalization. App. at 7, 20-21, 30. Moreover, the District Court emphasized that OMHSAS's ability to increase the number of community care placements was hampered by community opposition to further expansion in the neighborhoods where the community centers were located, App. at 23, and that increasing the number of community placements would eventually lead to a diminution of services for institutionalized persons under the Commonwealth's care. App. at 24.

Appellants challenge the Commonwealth's position on cost constraints, arguing that 1) the relief they request would require only negligible cost increases; 2) DPW could increase its community care budget by simply requesting additional funds from the legislature; and 3) DPW could shuffle its current budget to favor increased community care programs. We consider and reject each argument.[6]

First, Appellants dispute the District Court's factual conclusion that moving currently institutionalized persons into community settings would require significant capital outlay by the Commonwealth. Because Appellants anticipate that the lion's share of the community care costs would be offset by the savings reaped from hospital bed closures, they estimate that the additional community placements requested would have a net cost of $1 million. Appellants'

_____

[6] Appellants also argue that, in undertaking its cost analysis of the "resources available to the State," the District Court focused upon the wrong budget; that is, that the District Court erred in concluding that it should consider DPW's mental health budget, rather than the entire budget for DPW. Frederick L., 217 F. Supp. 2d at 592 ("The resources available to the State refers to the state's mental health budget and nothing beyond that budget.") (internal quotation and citation omitted). Although there are a few references to "resources available to the State," DPW's myriad non-mental health responsibilities, which include cash welfare distribution, medical assistance, food stamps provision, youth centers, forestry camps, and chaplaincies, have no nexus to the "care and treatment" of the mentally ill described in Olmstead. Id. at 587. Upon examination of the language used in Olmstead, we agree with the District Court that it is DPW's mental health budget, rather than DPW's more general budget, that must be considered. See Olmstead, 527 U.S. at 595, 596, 597, 603 (referring to state's "mental health budget" six times).

12

cost comparisons, however, are precisely the sort of reductive cost comparisons proscribed by the Olmstead plurality, 527 U.S. at 603-04, as well as by Justice Kennedy. Id. at 612-13 (Kennedy, J., concurring). In following Olmstead and rejecting Appellants' disfavored methodology, the District Court did not err.

Second, Appellants argue that the District Court erred by not considering DPW's ability to lobby the legislature for additional funds during the budgetary process. Under the budget process in the Commonwealth, DPW must submit a report to the Commonwealth requesting an operating budget for the upcoming year before DPW receives its budgetary allocation. The Governor may then accept or reject DPW's request. Appellants contend that DPW does not request the full amount necessary to fund all of the community placements requested. The District Court concluded that the pre-budgetary process "is beyond judicial scrutiny." Frederick L., 217 F. Supp. 2d at 593. We agree. This is not an issue of legislative immunity, which DPW has not claimed, but a recognition of the realities of the budgetary process. DPW explains that it would not have been able to request the full amount required to fund all of the community placements needed because it must make its budget request pursuant to the Governor's Guidelines, which limit the percent-increase that it may request. That process is unchallenged here. We cannot hold, as Appellants would have us do, that DPW should have requested additional

funding amounts beyond that which is permitted under the Governor's Guidelines.

Finally, Appellants argue that the District Court erred by concluding that DPW responsibly used its budgeted monies because DPW should have shifted money from other programs to fund additional community placements. Assuming a limited pool of budgetary resources, if DPW had siphoned off monies appropriated for institutional care for mental health patients in order to increase community placements, DPW would have run afoul of Olmstead prohibition on favoring those "who commenced civil actions" at the expense of institutionalized mental health patients who are not before the court. Any effort to institute fund-shifting that would disadvantage other segments of the mentally disabled population would thus fail under Olmstead. 527 U.S. at 604-06.

However, Appellants argue that DPW should re-allocate its funds to favor additional community placements to the detriment of budget items that are not associated with community care or the care of institutionalized persons. For example, the parties' stipulations explain that DPW requested additional funding for several non-community care items, such as approximately $9.5 million for a general 3.5% salary increase for state psychiatric services personnel; $2.5 million for contracted repairs; $186,000 for consultant fees; $5.7 million for specialized services; $420,000 for contracted personnel services; $372,000 for travel; $47,000 for

out-service training travel; $1.1 million for motorized and other rentals; $75,000 for library materials and supplies; $116,000 for other services and supplies; and $60.6 million for information systems. App. at 730-32. The Commonwealth explains that some of the aforementioned increases are mandated under the terms of the employees' union contract and the other costs assist in providing "a safe and secure environment" in which to provide "active treatment" to institutionalized patients. Appellees' Br. at 53-54.

Because the judiciary is not well-suited to superintend the internal budgetary decisions of DPW or evaluate its physical plant needs, we decline to rely on Appellants' assertion that the aforementioned costs are not essential to the upkeep of DPW's care-giving apparatus. Our rejection of Appellants' challenges to the District Court's analysis of the cost issues does not mean that we similarly adopt the court's acceptance of the Commonwealth's fundamental-alteration defense.

**B. Past Progress and Future Planning for Deinstitutionalization**

In setting forth the circumstances under which a state might be relieved of its responsibility to provide ADA relief on the basis of the fundamental-alteration defense, the Olmstead plurality provided the following hypothetical:

> If, for example, the State were to demonstrate that it

had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, t    h    e reasonable-modifications standard would be met.

Olmstead, 527 U.S. at 605-06. Appellants and Amici argue that DPW did not maintain a waiting list or have comprehensive, strategic plans to continue deinstitutionalization.

The District Court found that DPW begins discharge planning as soon as a patient is admitted, with DPW holding monthly meetings to determine which patients are ready for discharge. However, the Court acknowledged that, while the Southeast Region Mental Health Planning Task Force, which is composed of OMHSAS administrators, mental health care consumers and providers, had developed a five-year plan for integration in 1994, the Commonwealth has not demonstrated that it has a comprehensive or actionable plan to support increased integration through community placements or any other mechanisms. App. at 18.

Some courts have given considerable weight to the presence of a planning and/or waiting list referred to by

14

the Olmstead plurality as examples of factors to be considered in connection with the fundamental-alteration defense. The Makin plaintiffs had alleged that the state affirmatively "mismanag[ed] the wait list" for community care and the court found no evidence of any "comprehensive plan[s] to keep the waiting list moving." Makin, 114 F. Supp. 2d at 1035 (internal quotation and citation omitted). The court thus rejected the state's fundamental-alteration defense in light of the absence of a comprehensive integration plan, a slow-moving waiting list, and the state's vague protest of general fiscal problems.

In contrast, a Maryland district court noted that Maryland maintained a waiting list and a waiting list equity fund and also prioritized categories of crisis resolution for services; further, there was "no indication that the failure to move people off the waiting list result[ed] from an endeavor to keep the State's institutions fully populated," as proscribed in Olmstead. Williams v. Wasserman, 164 F. Supp. 2d 591, 633 n.37 (D. Md. 2001). Based in part on these factors, the court sustained the state's fundamental-alteration defense. Id. at 630-38.

Appellants, joined by Amici, urge that we adopt long-term planning as a new factor that should be used in determining whether a state is entitled to an affirmative defense to an ADA or RA claim. Amici argue as follows:

> The emphasis on a comprehensive plan

indicates that the Supreme Court intended to shield States that had focused on and planned for the need to place people into the community on a statewide basis, prior to and apart from the litigation before the Court. A comprehensive plan is more than an annual inquiry into whether there are extra funds left over in the budget to fund creation of community beds. It is long-term and central to the State's mental health policy, not an "add-on" or "extra funding" item subject to elimination at the first chill of budget difficulties.

Amici's Br. at 23. Appellants argue that the District Court should have rejected the Commonwealth's fundamental-alteration defense based on DPW's failure to develop comprehensive plans or a waiting list. The Commonwealth responds that Olmstead does not require the existence of a comprehensive plan nor does it state that a non-stagnant waiting list is the only way that a state can avoid liability. Appellees' Br. at 41 n.27.

Appellants also contend that under the facts of this case the District Court erred in crediting DPW's past progress in deinstitutionalization. The District Court initially noted that "[t]he declining state hospital population is an important aspect of this changing healthcare environment.

15

In the 1950s, Pennsylvania housed approximately 40,000 people in its state mental hospitals; at the time of trial [in 2002], fewer than three thousand patients were housed in the ten remaining OMHSAS-operated facilities." Frederick L., 217 F. Supp. 2d at 583 n.4. At the close of its opinion, the District Court concluded that "the record as a whole convincingly demonstrates that, over time, DPW has used its mental health budget to establish more and more community-based programs, and DPW will continue to do so, to the extent possible given fiscal realities." Id. at 593.

There is no reference in Olmstead to a state's past progress in deinstitutionalization as relevant to analyzing a fundamental-alteration defense. As Appellants argue, past progress is not necessarily probative of future plans to continue deinstitutionalizing. For example, although DPW funded more than 200 community placements in the past two fiscal years, only 33 placements are slated for next year. As such, Appellants argue that DPW's past progress should not provide grounds for relieving DPW of its responsibility to continue providing community care in the future.

It is true that the district court in Williams, which accepted Maryland's fundamental-alteration defense, relied most upon the state's "role in the course of de-institutionalization[, the] development of community-based treatment programs for all Maryland citizens with mental and developmental disabilities," and Maryland's long-standing policy leadership in supporting community-based mental health treatment. Williams, 164 F. Supp. 2d at 633. The Williams court noted that Maryland had "been gradually closing institutions and expanding the number and range of community-based treatment programs it offers for people with severe disabilities" and Maryland decreased its mental hospital population from 7,114 in 1970 to 1,200 in 1997. Id. at 634. As noted above, the District Court in the case before us also credited the Commonwealth's past progress. See Frederick L., 217 F. Supp. 2d at 593.

Although the District Court did not err in taking into account the Commonwealth's past progress in evaluating its fundamental-alteration defense, it was unrealistic (or unduly optimistic) in assuming past progress is a reliable prediction of future programs. One of our principal concerns is the absence of anything that can fairly be considered a plan for the future. The District Court made a finding that "Defendants have not demonstrated that they have a comprehensive effectively working plan for placing qualified persons with mental disabilities in less restrictive settings." Id. at 587. The court continued, "At trial, one of Defendants' witnesses, Gerald Radke, Deputy Secretary for OMHSAS, admitted such a plan is not in place." Id. The representative of the Commonwealth arguing before us disagreed with the District Court's conclusion that there was no such plan. She stated that "the district

16

court recognized several indicia of a plan at Norristown that we submit show that there is a plan." Tr. of Argument at 31. She conceded, however, that there is no piece of paper that represents that plan but her explanation of a plan (policies and procedures at NSH utilized for ongoing review of patients from the minute they come in and for discharge planning for each patient individually) falls far short of the type of plan that we believe the Court referred to in Olmstead.

The issue is not whether there is a piece of paper that reflects that there will be ongoing progress toward community placement, but whether the Commonwealth has given assurance that there will be. In that connection what is needed at the very least is a plan that is communicated in some manner. The District Court accepted the Commonwealth's reliance on past progress without requiring a commitment by it to take all reasonable steps to continue that progress. Under the circumstances presented here, our reading of Olmstead would require no less.

After all, what is at issue is compliance with two federal statutes enacted to protect disabled persons. The courts have held states throughout the country responsible for finding the manner to integrate the schools, improve prison conditions, and equalize funding to schools within the respective states, notwithstanding the states' protestations about the cost of remedial actions. The plaintiffs in this case are perhaps the most vulnerable. It is a gross injustice to keep these disabled persons in an institution notwithstanding the agreement of all relevant parties that they no longer require institutionalization. We must reflect on that more than a passing moment. It is not enough for DPW to give passing acknowledgment of that fact. It must be prepared to make a commitment to action in a manner for which it can be held accountable by the courts.

**IV.**

**CONCLUSION**

In analyzing whether there was sufficient evidence before the District Court to justify its acceptance of the Commonwealth's fundamental-alteration defense, we conclude that its factual findings are fully supported by the evidence of record. As noted in the foregoing discussion, many of the court's conclusions of law are also consistent with the governing legal principles. We believe that the cost constraints make it inappropriate for us to direct DPW to develop 60 community residential slots per year as Appellants request. Unlike Appellants, we credit the Commonwealth for its past progress in deinstitutionalization. We depart from the District Court's analysis in its assumption or prediction that past actions auger future commitments.

Accordingly, we will vacate the judgment of the District Court and remand so that it can direct the Commonwealth to

17

make a submission that the District Court can evaluate to determine whether it complies with this opinion.